**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>TREMAIN VAUGHN SCOTT (01),<br><br>    Defendant. | Case No. 15-40010-01-DDC |

**MEMORANDUM AND ORDER**

On January 21, 2015, United States Marshals Service (USMS) personnel, working alongside officers assigned to the Shawnee County Sheriff's Department Fugitive Task Force, conducted a "knock and talk" at a residence located at 3041 Southeast 12th Court in Topeka, Kansas. The officers sought to execute an arrest warrant for Nicholas Johnson. The residence belonged to Tearra Parker. After the officers entered Ms. Parker's residence, they identified and arrested Nicholas Johnson. The officers then executed a "protective sweep" of Ms. Parker's residence, during which they found the defendant in this case, Tremain Scott, hiding in a closet. The officers also found a firearm in the closet. Later, Mr. Scott later admitted he had handled this weapon occasionally for self-defense purposes. Mr. Scott now has been charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).

Mr. Scott has filed a motion seeking to suppress both the firearm and the statements he made to officers as fruit of an unlawful entry into and search of Ms. Parker's residence (Doc. 18). The government has filed a response (Doc. 23). After the Court conducted an evidentiary hearing on this motion on June 22, 2015, the parties filed supplemental briefs (Docs. 33 and 34).

1

Having considering the evidence and arguments the parties have presented, the Court denies Mr. Scott's motion for the reasons explained below.[1]

## I. Factual Background

On January 21, 2015, USMS Deputy Jerry Viera and officers with the Shawnee County Sheriff's Department Fugitive Task Force arrived at Southeast 12th Court in Topeka, Kansas, to execute an arrest warrant for Nicholas Johnson. As the officers approached the home, they heard a window slam shut. The officers also heard movement in the apartment consistent with people attempting to conceal themselves inside. Deputy Viera then banged on the door and announced that officers were present with an arrest warrant for Mr. Johnson.

Initially, Ms. Parker refused to open the door. The officers managed to communicate with her through the closed door, however, and told her, again, that they had an arrest warrant for Nicholas Johnson. When Ms. Parker continued to refuse to open the door, the officers contacted the maintenance worker at the apartment complex to obtain a key. They also informed Ms. Parker that she was violating her Department of Housing and Urban Development ("HUD") lease by harboring fugitives and permitting people not designated on the lease to live at her apartment. The officers concede they said this with the hope that it would persuade Ms. Parker to open the door. After about 10 minutes passed, the officers became concerned that the individuals inside might be arming themselves or concealing evidence. They advised Ms. Parker that if she did not open the door, they would break it down.

Eventually, Ms. Parker relented and opened the door. Almost immediately, the officers observed Mr. Johnson inside the apartment, in plain view in the living room. After identifying Mr. Johnson, approximately five law enforcement officers entered the apartment, guns drawn, to

---

[1] The parties agree that Mr. Scott's status as an overnight guest in Ms. Parker's residence confers on him standing to contest the search of the residence. *See* Doc. 23 at 2 (citing *Minnesota v. Olsen*, 495 U.S. 91, 99 (1990)).

arrest him.  Deputy Viera testified that, at this moment, he became concerned that someone else might be hiding in the apartment's bedroom.  There was no door separating the bedroom from the living room, but a bed sheet hung in the hallway and blocked officers' view into the bedroom.  Deputy Viera asked Ms. Parker if there was anyone else in the apartment.  She replied that there was not.

With Ms. Parker and Mr. Johnson in handcuffs, the officers proceeded to conduct a "protective sweep" of the apartment.  While the officers executed the sweep, Ms. Parker and Ms. Johnson remained seated on the living-room couch.  Deputy Viera entered the bedroom with Officer Sinclair.  He testified that while he was checking the bedroom, he heard Officer Sinclair give verbal commands to somebody behind him.  Deputy Viera turned and saw an individual he identified as the defendant in this case, Tremain Scott.  Mr. Scott had been hiding in the bedroom closet.  Mr. Scott had an outstanding warrant for his arrest on a domestic battery charge, so the officers also placed him under arrest.

After the officers arrested Mr. Scott, they took Mr. Johnson outside the residence.  They also placed Ms. Parker under arrest for obstructing their execution of the arrest warrant.  Ms. Parker remained in handcuffs for another 10 minutes, when the officers "unarrested" her.  By this point, Corporal Ruben Salamanca with the Shawnee County Task Force had arrived on the scene.  After the officers released Ms. Parker from custody, Corporal Salamanca spoke with her and obtained her consent to search her apartment.  Ms. Parker consented verbally and by signing a written "consent form."  Ms. Parker testified that she consented to the search only because she thought that the officers were going to search her home one way or another, with or without her consent.  She also testified that she believed the officers would arrest her and take away her housing if she did not agree to a search.

Based on her oral and written consent, the officers proceeded to search the rest of her apartment. During the search, they located a firearm in the closet near the front entrance. This firearm is the subject of the current felon in possession prosecution against the defendant, Tremain Scott.

## II.  Analysis

Mr. Scott asserts that three Fourth Amendment violations occurred during the events leading to his arrest and the discovery of the firearm. He argues that: (1) the officers' entry into Ms. Parkers' residence was unlawful under *Payton v. New York*, 445 U.S. 573 (1980); (2) the officers were not permitted to conduct a protective sweep under the circumstances; and (3) Ms. Parker did not voluntarily consent to the officers' search of her apartment. On these grounds, Mr. Scott moves to suppress, "any evidence obtained during the illegal search of his temporary residence, [and] any evidence obtained as a result of the illegal seizure of his property." Doc. 33 at 1.

### A.  Whether the Arrest Warrant Authorized Entry Into Ms. Parker's Home

The Supreme Court has held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within" the dwelling. *Payton v. New York*, 445 U.S. 573, 603 (1980). But the standards governing the legality of an officer's entry into a residence differ depending on whether the residence belongs to the arrestee or a third person. *See United States v. Thompson*, 402 F. App'x 378, 382 (10th Cir. 2010). *Payton* sets forth the standard governing entry into a suspect's own home. *Id.* "In light of *Patyon*," the Tenth Circuit "has created a two-prong test for determining whether an arrest warrant alone is sufficient to justify entrance into a home." *Id.* "For their entrance to be lawful, officers must have a reasonable belief the arrestee

4

(1) lives in the residence and (2) is within the residence at the time of entry." *Id.* But in *Steagald v. United States*, the Supreme Court observed that *Payton*'s standard "is plainly inapplicable when the police seek to use an arrest warrant as legal authority to enter the home of a *third party* to conduct a search." 451 U.S. 204, 214 n.7 (1981). Under *Steagald*, "[a]bsent exigent circumstances or consent, the police cannot lawfully search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." *Thompson*, 402 F. App'x at 382 (citing *Steagald*, 451 U.S. at 205-206).

As a preliminary matter, the Court must decide whether it should apply the *Payton* or *Steagald* standard to evaluate the lawfulness of the officers' entry into Ms. Parker's home. This question is resolved under first prong of the *Payton* test. *Id.* (citing *United States v. Gay*, 240 F.3d 1222, 1225 (10th Cir. 2001)). "If the officers reasonably believe the suspect lives at the residence, then *Payton* applies," and the "officers may enter on the authority of the arrest warrant, provided they reasonably believe the suspect is inside." *Id.* "If, however, the officers' belief that the suspect lives at the residence is not reasonable, then this implies the residence is a third-party residence." *Id.* "In that case, *Steagald* applies, *i.e.*, the officers' arrest warrant is insufficient—they need a search warrant to enter." *Id.*

Here, officers arrived at Ms. Parker's home hoping to execute an arrest warrant for Nicholas Johnson. The officers' believed that Mr. Johnson lived at this home because its address corresponded to the one listed on the "jacket" (*i.e.*, the cover sheet) of the arrest warrant. Mr. Scott's counsel emphasizes that Deputy Viera's cursory reading of the warrant jacket provided his only basis to believe that Mr. Johnson resided at this address. *See* Doc. 33 at 3 (noting that Deputy Viera did not "have any background information on the alleged misdemeanor battery," "did not have any specific knowledge of any investigation regarding Mr. Johnson's address," and

5

"did not have any information that Mr. Johnson had stayed at Ms. Parker's residence recently"). Deputy Viera's testimony at the suppression hearing confirmed this premise.

But the governing Fourth Amendment standards did not require Deputy Viera to verify Mr. Johnson's background information independently or otherwise corroborate Mr. Johnson's connection to the addresses shown on the warrant. Mr. Scott has identified no information that should have alerted Deputy Viera or the other officers of a need to conduct additional investigation. Nor does Mr. Scott contest the validity of the arrest warrant itself. An officer's reliance on an address listed on a valid arrest warrant is sufficient to support a reasonable belief that the suspect resides at a particular residence. *See Anderson v. Campbell*, 104 F.3d 367 (10th Cir. 1996) (finding officers' belief that suspect lived at the address listed on arrest warrant, though incorrect, was reasonable). Also, the movement the officers heard from inside the house when they announced their presence justified their suspicion that someone who had reason to evade arrest—possibly Mr. Johnson—was located inside the apartment.

The Court thus evaluates Mr. Scott's challenge to the officers' entry of Ms. Parker's home under *Payton* s's standard. Having concluded that the officers' belief that Mr. Johnson lived at the residence was a reasonable one, the Court turns to the second prong of *Payton*. This part of the analysis requires the Court to consider whether the officers had reasonable grounds to believe that Mr. Johnson was inside the residence when they arrived hoping to execute the arrest warrant. Based on the facts already described, the Court concludes that reasonable grounds did exist. Deputy Viera testified that the officers heard movement inside the apartment as they approached the door. To the officers, this suggested that one or more individuals were trying to conceal themselves inside the home. Mr. Johnson, who had an outstanding warrant for his arrest, had reason to conceal himself from law enforcement. These objective circumstances justified

their belief that Mr. Johnson was inside the home and thus satisfy the second prong of *Payton*. As things turned out, the officers' belief not only was reasonable—it was correct. When Ms. Parker finally opened the door, the officers saw Mr. Johnson in plain view inside the home.

### B.  Whether the "Protective Sweep" was Permissible

After the officers arrested Mr. Johnson, they proceeded to conduct a protective sweep of Ms. Parker's home. Mr. Scott asserts that the circumstances surrounding Mr. Johnson's arrest did not justify a protective sweep of the home.

Mr. Scott points out, correctly, that "[t]he Fourth Amendment does not sanction automatic searches of an arrestee's home." *United States v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005). Instead, the government must show that circumstances presented "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.* at 1185-86 (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)). The officers' subjective intent is not relevant to deciding whether a protective sweep is proper. Instead, the Court must determine whether objective circumstances "established a reasonable basis for them" to conduct a sweep. *Id.* at 1187.

At the suppression hearing, Deputy Viera described the circumstances that guided the officers' decision to conduct a protective sweep:

> In this circumstance – well, I was asked on direct if we worked multiple cases on this occasion, and Mr. Scott [the defendant] happened to be one of the cases we were working. We had reason to believe that he was also staying at this apartment and that he recently had a case filed on him for firing a weapon on Christmas of '14. And this was January of '15 so it was pretty recent from that time frame.
>
> The slamming of the window, the delay, the footsteps, it seemed like more movement than one person could make, to us. In our training and experience, when someone takes that long to open the door they're certainly secreting someone or something. The curtain that was hanging was also a factor. We were

> concerned that if Mr. Scott was in fact there and he did have a weapon and was behind that curtain that if we didn't sweep that we could possibly be injured by him.

Doc. 32 at 73-74. In addition, because Mr. Johnson made himself immediately present, the officers worried that the person responsible for the commotion inside the home just before they entered still remained concealed in the premises. Based on the totality of these circumstances, the Court concludes that the officers were justified in conducting a protective sweep of Ms. Parker's home. This included searching the closet where officers ultimately discovered Mr. Scott. *See Buie*, 494 U.S. at 334 (noting that the scope of protective sweep includes "closets and other spaces immediately adjoining the place of arrest").

## C.  Whether Ms. Parker Consented Voluntarily to Search

Although the protective sweep led officers to discover Mr. Scott, they discovered the firearm he allegedly possessed only after they conducted a search authorized by Ms. Parker's consent. Mr. Scott now argues that her consent was not voluntary, and so the Court must suppress the firearm.

The Tenth Circuit has approved a two-part test for determining whether an individual validly consented to a search. Under this test, the government must: "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given' and (2) 'prove that this consent was given without implied or express duress or coercion.'" *United States v. Sanchez*, 89 F.3d 715, 719 (10th Cir. 1996) (quoting *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996)). Mr. Scott asserts that her consent was not voluntary because officers obtained it only after threatening to break down her door, arresting her for obstruction, and threatening to get her housing revoked. Indeed, Ms. Parker testified that she consented only because, in her mind, the officers were going to search her home regardless whether she gave

them permission. She also testified that she feared the officers would arrest her and take away her housing if she did not comply with their request.

Corporal Salamanca's testimony portrays a different setting. He testified that Ms. Parker was "surprisingly" cooperative and friendly during the conversation when he asked for her consent to search her apartment. Corporal Salamanca explained to Ms. Parker that his purpose for coming to the scene was to remove any contraband from the premises. He asked if she had any such items in her apartment, and she answered no. He then asked for permission for himself and the other officers to search her property. She agreed to let them do so. Corporal Salamanca then presented her with a consent form. *See* Gov. Ex. 3. The consent form explicitly advised Ms. Parker of her constitutional right to decline his request. The form also stated that Ms. Parker's "written permission is being given by me to the above named officers voluntarily and without any threats or promises of any kind." *Id.* After obtaining verbal and written consent from Ms. Parker, the officers began the search and ultimately located the firearm now forming the basis for the possession charge against Mr. Scott.

Mr. Scott asserts that Ms. Parker's consent was tainted by the officers' unlawful entry and threats to take away her housing. But the Court already has concluded that the initial entry into her home was lawful. In addition, the Court credits Corporal Salamanca's testimony, which establishes that Ms. Parker was calm and cooperative when he asked for her consent. Finally, Mr. Scott relies on Ms. Parker's testimony that she did not believe she could refuse consent and that the officers would have searched her home anyway. But the written consent form specifically advised Ms. Parker of her right to refuse consent. And while she claims to believe that the officers would have searched her home anyway, nothing about the officers' actual conduct reasonably conveyed such an intention. Ms. Parkers conclusory assertion is not credible

9

and thus fails to nullify her consent.  *See United States v. Garcia Hernandez,* 955 F. Supp. 1361, 1372 (D. Utah 1996) (holding that defendant's "explanation that the officer would search anyway does not defeat [consent]," when objective circumstances establish consent is voluntary), *aff'd sub nom.*, *United States v. Hernandez*, 153 F.3d 729 (10th Cir. 1998).  Based on the totality of the circumstances, *see Sanchez*, 89 F.3d at 719, the Court finds that Ms. Parker consented to the search of her home freely and voluntarily.  The Court thus denies Mr. Scott's motion to suppress.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Scott's Motion to Suppress (Doc. 18) is denied.

**Dated this 22nd day of July, 2015, in Topeka, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**